In re ALL CHEMICAL ISOTOPE ENRICHMENT, INC., d/b/a Alchemie, Debtor.

ANDERSON COUNTY BANK, Plaintiff and Counter–Defendant,

v.

John P. NEWTON, Jr., Trustee, Defendant, Counter–Plaintiff, Cross–Plaintiff, and Cross–Defendant,

and

United States of America, Defendant, Counter–Plaintiff, Cross–Plaintiff, and Cross–Defendant.

Bankruptcy No. 3–89–01695.
Adv. No. 90–3147.

United States Bankruptcy Court, E.D. Tennessee.

May 9, 1991.

Jenkins & Jenkins, Michael H. Fitzpatrick, Knoxville, Tenn., for Anderson County Bank.

Gentry, Tipton, Kizer & Little, Maurice K. Guinn, Knoxville, Tenn., for John P. Newton, Jr., trustee.

John W. Gill, Jr., U.S. Atty., Pamela G. Steele, Asst. U.S. Atty., Knoxville, Tenn., for U.S.

## MEMORANDUM

RICHARD S. STAIR, Jr., Bankruptcy Judge.

At issue in this adversary proceeding is which of the two cross-claimants, United

States Department of Energy (DOE) or the Chapter 7 trustee, John P. Newton, Jr., is entitled to a $2,000,000 escrow fund on deposit in Anderson County Bank. Additionally, the trustee and DOE seek a determination of whether DOE is entitled to interest earned on the $2,000,000 subsequent to August 15, 1989. Claims raised in the complaint filed July 2, 1990, by the original plaintiff, Anderson County Bank, and in counter-claims filed by the original defendants, John P. Newton, Jr., Trustee, and DOE, have been dismissed, without prejudice, pursuant to an agreed "Stipulation Of Dismissal" tendered by the parties and entered April 9, 1991.

The record before the court consists of written facts and documents stipulated by the parties under the terms of written "Stipulations" filed March 14, 1991, together with testimony and additional documents introduced at a trial held March 20, 1991.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(A) and (O) (West Supp.1991).

I

From the record before it, the court makes the following findings: [1]

1. On November 20, 1987, the debtor, All Chemical Isotope Enrichment, Inc. (Alchemie, or the debtor) and DOE entered into an agreement entitled Centrifuge Equipment Agreement and Bill of Sale (Agreement) (Exhibit 1). The Agreement embodies those terms and conditions material to the debtor's acquisition of unclassified and classified equipment associated with DOE's sale of surplus assets subsequent to termination of its Gas Centrifuge Enrichment Program (GCEP) in Pike County, Ohio.

2. Conditions essential to the debtor's acquiring ownership of the unclassified equipment are contained in paragraph 3 of the Agreement. This paragraph provides in material part:

3. *Ownership of Unclassified Equipment*

A. Ownership of the unclassified equipment shall vest in AlChemIE upon:

(i) Receipt of the opinion by the Attorney General that the proposed transfer of equipment to AlChemIE is not inconsistent with the antitrust laws, as required by FPMR 101–45.310; and

(ii) Deposit by AlChemIE of $2 million in an escrow account pursuant to an agreement between AlChemIE and a bank, the terms of which have heretofore been approved by DOE.

3. With regard to the escrow account, paragraph 3 of the Agreement further provides:

B. The purpose of the $2 million escrow account is to additionally compensate DOE for the *unclassified* equipment should AlChemIE not obtain ownership of the *classified* equipment. Therefore, the parties agree that:

(i) Interest on the escrowed funds shall be the property of AlChemIE;

(ii) The escrow agreement shall terminate and the funds be released to AlChemIE when AlChemIE acquires ownership of the classified equipment pursuant to paragraph 4 hereof;

(iii) Should AlChemIE not obtain ownership of the *classified* equipment and this Agreement is terminated under paragraph 4 after ownership of the *unclassified* equipment has vested in AlChemIE, the escrowed funds shall become the property of DOE without requirement of any legal action. (emphasis in original)

4. The Agreement provides at paragraph 4.A. that ownership of the classified equipment shall vest in Alchemie only upon the occurrence of seven enumerated conditions precedent.[2] Paragraph 4 of the Agreement also provides in material part:

B. Failure of DOE to approve any of the foregoing [conditions precedent] shall not be a "dispute" within the meaning of

---

**1.** These findings are taken primarily from the stipulations and exhibits filed by the parties on March 14, 1991. The numerical designation of paragraphs in this Memorandum does not necessarily correspond to numbered paragraphs in the stipulations.

**2.** These conditions precedent are numbered (i) through (vii).

paragraph 16. Accordingly, AlChemIE understands and agrees that DOE's determination with respect to each of the above ... [conditions precedent] is unilateral and final and is not subject to administrative or judicial review in any forum.

C. If events (i) through (vii) of paragraph A have not occurred within one year after the date of execution hereof or any extension agreed to by parties, this Agreement shall terminate.[3] AlChemIE shall make no claim for refund of any payments it may have made to DOE prior to termination.

5. On March 4, 1988, Alchemie received notice that the Attorney General had concluded that the proposed transfer of unclassified equipment was not inconsistent with the anti-trust laws. Pursuant to the provisions of paragraph 3.C. of the Agreement, Alchemie had thirty days from receipt of this notice in which to deposit the $2,000,000 in the escrow account. This time was, however, extended to May 4, 1988, by mutual agreement.

6. On May 4, 1988, Alchemie and Anderson County Bank, as "Escrow Agent," entered into and executed the written "Escrow Agreement" contemplated under paragraph 3.A.(ii) of the Agreement (Exhibit 6). The "Escrow Agreement," approved by DOE, incorporates verbatim into its terms the provisions of paragraph 3.B. of the Agreement and provides in material part:

[T]o additionally compensate DOE under certain circumstances, AlChemIE has agreed to post an escrow account in the amount of Two Million Dollars, with the terms and conditions of said account governed by this document, and

. . . .

B. The purpose of the $2 million escrow account is to additionally compensate USDOE for the unclassified equipment should AlChemIE not obtain ownership of the classified equipment. Therefore, the parties agree that:

(i) Interest on the escrowed funds shall be the property of AlChemIE;
(ii) The escrow agreement shall terminate and the funds be released to AlChemIE when AlChemIE acquires ownership of the classified equipment pursuant to paragraph 4 hereof;
(iii) Should AlChemIE not obtain ownership of the *classified* equipment and this Agreement is terminated under paragraph 4 after ownership of the *unclassified* equipment has vested in AlChemIE, the escrowed funds shall become the property of DOE without requirement of any legal action.

. . . .

NOW, THEREFORE, in order to establish an escrow account which meets the foregoing criteria, AlChemIE and A.C.B. [Anderson County Bank] agree as follows:

1. AlChemIE hereby deposits Two Million Dollars with A.C.B. which shall hold said funds as Escrow Agent.

2. Interest generated from the escrowed funds shall be the property of AlChemIE and shall be paid periodically to AlChemIE, at AlChemIE's direction.

3. The disposition of the escrowed funds shall occur as follows:

a) The escrowed funds ($2 million without deduction) shall be remitted to USDOE, in accordance with the terms of this agreement.

b) If AlChemIE performs the actions necessary to obtain ownership of classified gas centrifuge equipment pursuant to Paragraph 4 of the AlChemIE/USDOE agreement, then, upon submission of proof thereof to the Escrow Agent, the escrow funds shall be disbursed upon demand to AlChemIE.

c) If AlChemIE obtains ownership of the unclassified gas centrifuge equipment but does not obtain ownership of the classified equipment, then, upon submission of proof thereof to the Es-

---

**3.** Extensions of the one year compliance date, including two postpetition extensions, were granted by DOE through modifications to the Agreement.

crow Agent, the escrow funds shall be disbursed upon demand to USDOE.

d) For purposes of this Agreement, "Proof" shall be defined as an instrument signed by USDOE and attesting to the Escrow Agent the appropriate disposition of the escrowed funds.

e) At the time of disbursement under any conditions hereof, accrued interest shall be paid to AlChemIE.

4. It is expressly understood and acknowledged that the escrowed funds are not to be pledged, assigned, or in any manner encumbered except as addressed herein.

The "Escrow Agreement" is signed by appropriate representatives of the debtor, DOE, and Anderson County Bank, each of whom, by their signatures, attest that they "read, understood, and concurred" with the "Escrow Agreement."

7. On May 4, 1988, five individuals, A. Andrew Carey, Stephen A. Irving, P. Diane Mealer, John H. Smelser, Jr., and Judith Ann Wilson, each borrowed the sum of $450,000 from Anderson County Bank to fund the escrow account. These loans are evidenced by promissory notes executed by each individual (Exhibit 4). Four hundred thousand dollars ($400,000) from the proceeds of each of the five loans was deposited to the escrow account established under the "Escrow Agreement." [4]

8. Prior to the filing of Alchemie's bankruptcy petition, DOE had no knowledge that the source of the $2,000,000 escrow fund on deposit at Anderson County Bank was any entity other than Alchemie.

9. On May 4, 1988, Robert E. Lynch, the DOE GCEP contracting officer, sent a letter to Anderson County Bank acknowledging receipt of the executed "Escrow Agreement" and establishment of the

$2,000,000 escrow account (Exhibit 8). Mr. Lynch states in his letter that "the Department of Energy [accordingly] conveys title to the unclassified GCEP equipment free and clear of encumbrances to Alchemie Corporation."

10. Also on May 4, 1988, unbeknownst to DOE, the debtor, pursuant to a corporate resolution (Exhibit 24), executed two security agreements in favor of Anderson County Bank. One of these security agreements granted the bank a security interest in the debtor's rights in the unclassified equipment and the second granted the bank a security interest in the debtor's contract rights under the Agreement (Exhibit 11). These security agreements were executed by the debtor to secure the five $450,000 promissory notes executed by A. Andrew Carey, Stephen A. Irving, P. Diane Mealer, John H. Smelser, Jr., and Judith Ann Wilson. The debtor, on the same date, also executed an "Hypothecation Agreement" in favor of Anderson County Bank (Exhibit 12).[5] Anderson County Bank filed financing statements locally and centrally in Ohio and Tennessee in order to perfect its security interest under the two security agreements.[6]

11. On June 20, 1989, Alchemie filed its voluntary petition under Chapter 11.

12. DOE granted postpetition modifications to the Agreement on June 30 and July 14, 1989, extending the date within which Alchemie could perform the remaining conditions precedent to transfer of title to the classified equipment to August 15, 1989 (Exhibit 2). DOE did not file a motion requesting the court to compel Alchemie to assume or reject the Agreement within a specified time.

---

4. Closing statements associated with four of the loans establish that each individual borrower paid $20,000 to Anderson County Bank in "Loan Fees," plus a $30,000 "Borrower's Attorney & Consultants Fee" (Exhibit 5).

5. The "Hypothecation Agreement" provides, *inter alia,* that Alchemie "does hereby hypothecate and pledge as security … to Anderson County Bank … all its right, title and interest" in the Agreement.

6. The questionable nature of these actions on the part of Anderson County Bank in light of its fiduciary status as "Escrow Agent" under the "Escrow Agreement," and in light of the unambiguous language of paragraph 4 of the "Escrow Agreement," quoted *supra,* will not be addressed in this Memorandum.

13. On August 11, 1989, DOE gave notice to Alchemie by letter that it would not further extend the Agreement (Exhibit 14).

14. On August 11, 1989, the debtor filed a motion to extend the contract termination date. After a hearing held August 15, 1989, the court denied the debtor's motion. An order denying the motion was entered August 16, 1989. Thereafter, on October 24, 1989, the court amended its opinion rendered August 15, 1989, to conclude that the Agreement was subject to the provisions of Bankruptcy Code § 108(b), and that the debtor's right to perform under the Agreement was accordingly extended through August 21, 1989.[7]

15. By letters dated August 16 and 17, 1989, DOE made demand upon Anderson County Bank that the funds in the escrow account be disbursed to DOE (Exhibit 17). The DOE demands were not complied with and the $2,000,000 remains on deposit at Anderson County Bank.

16. On October 20, 1989, an order was entered converting the debtor's Chapter 11 case to a case under Chapter 7. John P. Newton, Jr., was appointed interim trustee and has thereafter served as permanent trustee in the Chapter 7 case.

17. On December 18, 1989, the trustee filed a motion requesting an extension of time to assume or reject certain executory contracts of the debtor, including the Agreement. On January 18, 1990, an order was entered granting an extension of time without prejudice to the rights of DOE to assert the Agreement had terminated under its own terms.

18. On March 19, 1990, the trustee filed a second motion for extension of time to assume or reject executory contracts. The court entered an order granting this motion on April 22, 1990. On June 21, 1990, the trustee filed a third motion for an extension of time to assume or reject executory contracts. This motion was withdrawn by the trustee. The trustee did not file a motion to assume the Agreement.

19. On July 2, 1990, Anderson County Bank filed the complaint commencing this adversary proceeding. Through its complaint as originally filed, Anderson County Bank sought a determination that its interest in the $2,000,000 escrow fund was superior to the interest of the trustee and DOE.

20. The Agreement was an executory contract when the debtor's Chapter 11 petition was filed on June 20, 1989.

21. As of June 20, 1989, the date the debtor filed its voluntary petition under Chapter 11, and October 20, 1989, the date the debtor's case was converted to Chapter 7, some but not all of the seven conditions precedent to the debtor's acquisition of the classified equipment as enumerated at paragraph 4.A. of the Agreement had been fulfilled.

II

In an "Agreed Final Pretrial Order" entered March 1, 1991, the trustee and DOE framed the issues to be resolved by the court in the following terms:

(1) Whether the $2,000,000.00 escrow fund was property of the estate when the debtor's petition was filed on June 20, 1989?

(2) Whether the November 20, 1987 Centrifuge Equipment Agreement and Bill of Sale ("Agreement"), including amendments, between the debtor and the Department of Energy was an executory contract on the June 20, 1989 bankruptcy

---

7. Code § 108, entitled Extension of time, provides in material part:

(b) Except as provided in subsection (a) of this section, if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor or an individual protected under section 1201 or 1301 of this title may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any

other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of—

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) 60 days after the order for relief.

11 U.S.C.A. § 108 (West Supp.1991).

petition date? [8]

(3) If the Agreement was an executory contract what is the effect of the rejection of the Agreement, pursuant to 11 U.S.C. § 365, upon the claims of the United States and the trustee to the $2,000,000.00 escrow?

(4) Is the trustee estopped from asserting any interest in the escrow funds?

(5) Whether the claim of the United States is an "account" within the scope of Tenn.Code Ann. § 47–9–106 (Supp. 1990)?

(6) Whether the interest of the United States in the $2,000,000.00 escrow was perfected when the debtor's bankruptcy petition was filed on June 20, 1989?

(7) Whether the United States is entitled to any of the interest earned on the escrow funds subsequent to August 15, 1989?

(8) Whether jurisdiction of these matters as they relate to the United States rests solely in the United States Claims Court?

The court concludes that a resolution of Issues No. (1), (7) and (8) will be dispositive of the claims between the trustee and DOE. Issues No. (2), (3), (4), (5), and (6) need not be considered. The jurisdictional issue will be considered first.

### ISSUE NO. (8)

### JURISDICTION

Pleadings filed by DOE raise a jurisdictional question which is designated Issue No. (8) in the "Agreed Final Pretrial Order." However, DOE, in its pretrial memorandum, does not appear to seriously rely upon this issue. Nonetheless, while the

court will not belabor the jurisdictional question, it has been raised and must be addressed.

In its pretrial memorandum DOE avers that "[t]o the extent the Court finds that the trustee has a cognizable claim arising from the ... [Agreement], the case should be transferred to the United States Claims Court pursuant to the Tucker Act, 28 U.S.C. § 1346." [9] Government's Memorandum of Law, p. 10.

■■■ The Agreement at paragraph 16.-A. provides that it is subject to the Contract Disputes Act of 1978 (the Act), 41 U.S.C.A. § 601–13 (West 1987 & Supp. 1991). Under the Act, disputes arising under contracts regarding the disposal of personal property by the government must first be presented to the contracting officer for decision. If the contracting officer's decision is disputed, it may be appealed to an agency board of contract appeals, if established in an executive agency, and, ultimately, to the United States Claims Court. Until the contracting officer has issued his final decision, there is no appealable dispute. This is the exclusive scheme which Congress has enacted for the resolution of contract disputes involving the government's disposal of property.

■■ However, Congress through the Bankruptcy Code has also evinced an intention to enact a particularized statutory scheme governing bankruptcy. Therefore, as observed by one court, "the conflict presented is whether the policy outlined by the Bankruptcy Code outweighs that contained in ... [the Act]." *Misener Indus., Inc. v. United States (In re Misener In-*

---

**8.** This issue appears misstated or inappropriate in light of paragraph (20) of the written Stipulations (paragraph 20, *supra* ) filed by the parties on March 14, 1991, whereby the parties stipulate that "[t]he Agreement between the debtor and the United States was an executory contract when the debtor's petition was filed on June 20, 1989."

**9.** Section 1346 of title 28 provides in material part:

**United States as defendant**

    (a) The district courts shall have original jurisdiction, concurrent with the United States Claims Court, of:

       . . . .

    (2) Any ... civil action or claim against the United States ... *except* that the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort which are subject to sections 8(g)(1) and 10(a)(1) of the Contract Disputes Act of 1978.

28 U.S.C.A. § 1346 (West 1976 & Supp.1991) (emphasis added).

*dus., Inc.)*, 54 B.R. 89, 90 (Bankr.M.D.Fla. 1985). The court in *Misener,* in a dispute involving progress payments due the debtor under a barge construction contract with the United States Army Corp. of Engineers, concluded, on the basis of "prior established case law," that "absent countervailing considerations no discretion is left to the Bankruptcy Court to do anything but defer to the ASBCA [Armed Services Board of Contract Appeals]." 54 B.R. at 90 (citations omitted). The court went on to state that "the field of government contract disputes is 'highly esoteric and technical' and is better left to the ASBCA." *Id.* at 91, (*quoting Gary Aircraft Corp. v. United States (In re Gary Aircraft Corp.)*, 698 F.2d 775 (5th Cir. 1983)).

The primary issue before this court involves a determination of whether the $2,000,000 escrow fund is property of the estate under Bankruptcy Code § 541. The term "property of the estate" has its origin in the Bankruptcy Code. Complaints or motions involving "property of the estate" initiate "proceedings arising under title 11," which are cognizable in the bankruptcy court as core proceedings. *See* 28 U.S.C.A. § 1334(b) & (d) (West Supp.1991); 28 U.S.C.A. § 157(a) & (b) (West Supp.1991). This court has jurisdiction over the issues involving the trustee and DOE in this adversary proceeding.

### ISSUE NO. (1)

### PROPERTY OF THE ESTATE

The threshold issue the court is called upon to resolve is whether the $2,000,000 escrow fund on deposit in Anderson County Bank is property of the estate. A determination that this fund is not property of the estate effectively moots the remaining issues existing between the trustee and DOE. For the reasons discussed below, the court concludes that the $2,000,000 is not property of the estate and that under the terms of the "Escrow Agreement" DOE's interest in this fund is superior to that of the trustee.

 The filing of a bankruptcy petition creates an estate comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C.A. § 541(a)(1) (West 1979 & Supp. 1991). The legislative history of this section makes clear that this provision was intended to be broad in scope. *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204–05, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983) (*citing* S.Rep. No. 95–989, p. 82 (1978) and H.R.Rep. No. 95–595, p. 367 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787); *Forbes v. Lucas (In re Lucas)*, 924 F.2d 597, 600 (6th Cir.1991). However, this broad definition is not without limits. The Eighth Circuit has noted:

[T]he definition was not designed to enlarge the debtor's rights against others beyond those existing at the commencement of the case. In fact, the broad definition of the debtor's estate is modified and limited by subsection (d) of section 541 of the Code. 11 U.S.C. § 541(d) states:

Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate under subsection (a) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

Thus, where the debtor holds bare legal title without any equitable interest, the estate acquires bare legal title without any equitable interest.

*N.S. Garrott & Sons v. Union Planters National Bank of Memphis (In re N.S. Garrott & Sons)*, 772 F.2d 462, 466 (8th Cir.1985) (citations omitted).

That the scope of § 541(a)(1) is not without limits is emphasized by the Supreme Court:

The legislative history indicates that Congress intended to exclude from the estate property of others in which the debtor had some minor interest such as a lien or bare legal title.

*Whiting Pools,* 462 U.S. at 204 n. 8, 103 S.Ct. at 2313 n. 8, 76 L.Ed.2d at 522 n. 8.

The Eighth Circuit in *N.S. Garrott* summarized the law of § 541 as "suggesting

that an interest limited in the hands of the debtor is equally limited in the hands of the estate...." 772 F.2d at 466. Likewise, the Ninth Circuit has stated:

> [Section 541(a)(1)] ... merely defines what interests of the debtor are transferred to the estate. It does not address the threshold questions of the existence and scope of the debtor's interest in a given asset.

*State of California v. Farmers Markets, Inc. (In re Farmers Markets, Inc.)*, 792 F.2d 1400, 1402 (9th Cir.1986).

▇ In sum, although the scope of § 541(a)(1) in defining "property of the estate" is all encompassing, it cannot be utilized to enhance the nature or extent of the debtor's interest in property as that interest exists at the time a bankruptcy petition is filed. The trustee or debtor in possession succeeds to no greater interest in an asset than that held by the debtor at the time the bankruptcy petition is filed. *See Cedar Rapids Meats, Inc. v. Hager (In re Cedar Rapids Meats, Inc.)*, 121 B.R. 562, 569 (Bankr.N.D.Iowa 1990).

▇ The court must look to nonbankruptcy law to determine the nature and extent of the debtor's interest in property. *See 4 Collier On Bankruptcy*, ¶ 541.02[1] (15th ed. 1990). Absent a federal provision to the contrary, property rights under § 541 are defined by state law. *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); *Jones v. Atchison (In re Atchison)*, 925 F.2d 209, 210 (7th Cir.1991).[10]

▇ Under Tennessee law, an escrow is defined generally as "a conditional delivery of a written instrument to a stranger, to be kept by him until certain conditions be performed, and then be delivered over to the grantee." 11 Tennessee Jurisprudence, Escrow § 1, p. 113 (1984) (footnote omitted). This definition is insufficient to provide the court with guidance regarding the rights of Alchemie and DOE in the $2,000,000 escrow fund at the time Alchemie filed its bankruptcy petition. Reported cases provide little help. *See, e.g., Radiophone Broadcasting Station v. Imboden*, 183 Tenn. 215, 191 S.W.2d 535, 537 (1946) ("Where an escrow agreement is definitely arrived at and a valid deposit in escrow made, neither party can revoke it without the consent of the other."); *Johnson v. Branch*, 30 Tenn. (11 Hum.) 521 (1851) ("[T]o constitute an escrow, it was necessary that the writing obligatory be delivered to a third person, to be held by him until the conditions upon which it was to become absolute, be complied with."); *Evans v. Gibbs*, 25 Tenn. (6 Hum.) 405, 407 (1846) ("[I]t is incumbent on him who alleges it to be an escrow ... to prove affirmatively, not that the principal promised something further should be done, by way of inducement to his execution of the instrument, but that performance of such further act was the condition upon which he was to become bound, or the instrument to be delivered as his act and deed.") While these cases and others are instructive as to the components essential to the establishment of an escrow in Tennessee, they provide no assistance to the court in helping it determine the interests of the respective claimants in the $2,000,000 escrow fund at issue in this adversary proceeding. Decisions in other jurisdictions do, however, provide such assistance.

"[W]hether an escrow constitutes property of a debtor's estate depends entirely on the nature and circumstances of the escrow in question." *World Communications, Inc. v. Direct Marketing Guaranty Trust (In re World Communications, Inc.)*, 72 B.R. 498, 501 (D.Utah 1987). Factors material to the determination include, but are not limited to, "whether the debtor initiated and/or agreed to the creation of the escrow, what if any control the debtor exercises over it, the incipient source of it, the nature of the funds put into it, the recipient of its remainder (if any), the target of its

---

**10.** Paragraph 15 of the Agreement, entitled *Applicable Law,* provides:

> This contract shall be construed in accordance with the internal law of the United States applicable in the United States Federal Courts to contracts to which the Government of the United States of America is a party, including, but not limited to the Atomic Energy Act of 1954, as amended.

> The parties do not suggest that their respective interests in the escrow fund can be determined other than by application of state law.

benefits, and the purpose for its creation." *World Communications*, 72 B.R. at 500.

The nature of the escrow in the instant proceeding stems from the Agreement, the material terms of which are incorporated into the "Escrow Agreement." The purpose of the $2,000,000 escrow fund is to "additionally compensate DOE for the *unclassified* equipment should Alchemie not obtain ownership of the *classified* equipment." (Exhibit 1, paragraph 3.B.; Exhibit 6) (emphasis in original). The debtor was entitled to the escrow funds only when it acquired ownership of the classified equipment upon satisfaction of the seven conditions precedent enumerated at paragraph 4.A. of the Agreement. Thus, at the time it filed its bankruptcy petition, the debtor's entitlement to the $2,000,000 fund was wholly contingent upon its acquisition of the classified equipment. It did not acquire the classified equipment either prepetition or postpetition.

A determination that the $2,000,000 is property of the estate and should, therefore, be released to the trustee would be contrary to the express terms of the "Escrow Agreement" and would effectively convert the debtor's right in the fund to a noncontingent right. In other words, the court would be required to ignore or rewrite the terms of the "Escrow Agreement." This court agrees with conclusions reached by the Eighth Circuit in *Carlson v. Farmers Home Administration (In re Newcomb)*, 744 F.2d 621 (8th Cir.1984), where that court, interpreting Missouri law, stated in material part:

> [A]n escrow is something more than a contract—it is a method of conveying property. When property is delivered in escrow the depositor loses control over it and an interest in the property passes to the ultimate grantee under the escrow agreement.
>
> . . . .
>
> At the creation of the escrow there was an unavoidable transfer which left the debtor with only a contingent right to the escrowed fund....

*Id.* at 624 & 627. The Sixth Circuit is in accord. *See Cate v. Nicely (In re Knox Kreations)*, 656 F.2d 230 (6th Cir.1981) (A payment from an escrow account could not be avoided as a preference because the relevant transfer occurred beyond the preference period when the escrow was created.)

In sum, the estate does not take any better interest in the escrow fund than the debtor held prior to the filing of its petition. This conclusion is more succinctly stated in the following terms: "Any claim, contingency or chose in action against the trust fund [or escrow] is the property of the estate but the fund itself is not." *In re Palm Beach Heights Development & Sales Corp.*, 52 B.R. 181, 183 (Bankr.S.D.Fla. 1985). Further, this conclusion gives effect to the intent of Alchemie and DOE in executing the "Escrow Agreement." The estate receives what the debtor bargained for under the Agreement, *i.e.*, the right to the $2,000,000 upon acquisition of the classified equipment. The Agreement has the same effect in bankruptcy as it did out of bankruptcy in that upon filing its petition, Alchemie, as debtor in possession, continued to hold only a contingent interest in the fund. Only upon acquisition of the classified equipment would the debtor or trustee have any interest in the $2,000,000 escrow fund.

This result hardly works a hardship on the debtor or its creditors since Alchemie was not the source of the $2,000,000 fund deposited to the escrow account. Notwithstanding that the debtor purported to grant Anderson County Bank a security interest in the unclassified equipment and in its contract rights under the Agreement to secure each of the $450,000 notes executed by the five individuals, there is nothing in the record to establish that Alchemie guaranteed those obligations or is in any way liable to the individuals. In fact, the corporate resolution authorizing Alchemie to execute the security agreements in favor of Anderson County Bank specifically provides that the collateral is pledged to secure "the *indebtedness of*" the five individuals. (Exhibit 24) (emphasis added).

The $2,000,000 escrow fund was not property of the estate at the time Alchemie filed its bankruptcy petition. Further, it did not become property of the estate at any time subsequent to the filing of the

petition. Upon termination of the Agreement on August 15 or 21, 1989, ownership of the $2,000,000 vested in DOE.

## ISSUE NO. 7

### DOE'S ENTITLEMENT TO INTEREST

■ As of August 15, 1989, the date the Agreement terminated by its own terms, or August 21, 1989, the date the Agreement terminated by giving effect to Code § 108(b), the specific date is immaterial, Alchemie had failed to comply with the conditions precedent to its acquisition of the classified equipment. Paragraph 3.B.(iii) of the Agreement, which is also incorporated into the "Escrow Agreement," provides:

Should AlChemIE not obtain ownership of the *classified* equipment and this Agreement is terminated under paragraph 4 [of the Agreement] after ownership of the *unclassified* equipment has vested in AlChemIE, the escrowed funds shall become the property of DOE without requirement of any legal action. (emphasis in original).

The above provision is unambiguous. Upon termination of the Agreement, the escrowed funds became property of DOE. Alchemie had no further contingent interest in the fund. The debtor and, upon conversion, the trustee had no claim to interest accruing after August 15, 1989.[11]

### III

In light of the court's conclusion that the debtor had no interest in the $2,000,000 escrow fund at any time prior or subsequent to bankruptcy and that the escrow fund is, therefore, not property of the estate, the court need not consider those issues in the "Agreed Final Pretrial Order" designated (2), (3), (4), (5), and (6).

This Memorandum constitutes findings of fact and conclusions of law as required by Fed.R.Bankr.P. 7052. An appropriate judgment will be entered.

### JUDGMENT

For the reasons set forth in the Memorandum filed this date containing findings of fact and conclusions of law as required by Fed.R.Bankr.P. 7052, it is ORDERED, ADJUDGED, and DECREED as follows:

1. That the $2,000,000 escrow fund on deposit in Anderson County Bank was not property of the estate on June 20, 1989, nor did it thereafter become property of the estate.

2. That the $2,000,000 escrow fund on deposit in Anderson County Bank is the property of and belongs to the cross-plaintiff, United States of America.

3. That all interest earned on the $2,000,000 escrow fund in the Anderson County Bank subsequent to August 15, 1989, is the property of and belongs to the cross-plaintiff, United States of America.

4. That the cross-claim asserted by the cross-plaintiff, John P. Newton, Jr., Trustee, against the cross-defendant, United States of America, is DISMISSED.

---

11. For purposes of the issue involving DOE's entitlement to interest, the parties, through the "Agreed Final Pretrial Order," accept August 15, 1989, rather than August 21, 1989, as the controlling date.