**In re James Harrison YEARY, and Linda Jensen Yeary, husband and wife, Debtors.**

**SONITROL FINANCIAL CORPORATION, a Delaware Corporation, now known as Advantor Capital Corporation, a Virginia corporation, Plaintiff,**

v.

**OKLAHOMA CITY ABSTRACT & TITLE CO., an Oklahoma corporation, James Harrison Yeary and Linda Jensen Yeary, husband and wife, Defendants.**

Bankruptcy No. 92–18419(LN).

Adv. No. 93–1050–(LN).

No. CIV–93–1247–A.

United States District Court, W.D. Oklahoma.

March 15, 1994.

John B. Heatly, Fellers Snider Blankenship Bailey & Tippens, Oklahoma City, OK, for plaintiff Sonitrol Financial Corp.

James B. Dixon, Oklahoma City, OK, for defendant Oklahoma City Abstract & Title Co.

Steven L. Minty, Mark E. Monfort and David A. Kline, Kline & Kline, Oklahoma City, OK, for debtors James Harrison Yeary and Linda Jensen Yeary.

### ORDER

ALLEY, District Judge.

Before the Court are Cross–Motions For Summary Judgment. Each party has responded to their opponent's respective motion and the issues are now ripe for ruling. In addition, a hearing was held on March 1, 1994, at which time the Court heard further argument from the parties. Based upon a review of the undisputed facts, the relevant law and the arguments presented both in brief and at the hearing, the Court rules as follows.

### STATEMENT OF UNDISPUTED FACTS

This controversy has its roots in a prior civil action, CIV–86–2703–A, in this Court between Sonitrol Corporation and its subsidiary, Sonitrol Financial Corporation (SFC), and Sonitrol of Oklahoma City (SOKC), wholly owned by the defendants James Harrison Yeary and Linda Jensen Yeary ("the Yearys"). In 1986, plaintiffs sued SOKC for breach of their franchise agreement with Sonitrol, breach of their equipment lease agreement with SFC and failure to pay on a note from SFC. On September 16, 1987, the Court granted Sonitrol and SFC partial summary judgment against SOKC for all amounts due on the equipment lease agreement.

After extensive negotiations, in December 1987, the parties reached a settlement. In essence, the settlement required plaintiffs to forebear on executing on the outstanding judgment in exchange for two promissory notes by SOKC (one for $337,169.39 and the other for $94,096) with final payment due on or before January 1, 1993. To provide comfort, the Yearys pledged their entire stock interest in SOKC. The settlement consisted of several documents: the Settlement Agreement, dated December 29, 1987; two Promissory Notes executed by SOKC and guaran-

teed by James Yeary for SOKC, dated January 1, 1988; a Stock Pledge Agreement by SOKC and the Yearys in favor of Sonitrol and SFC, dated January 18, 1988; an Escrow Agreement executed by the Yearys and SOKC in favor of Sonitrol and SFC, designating Oklahoma City Abstract and Title Company as escrow agent to hold the SOKC stock; and a Stock Power, dated September 18, 1988 and executed by the Yearys, selling, assigning and transferring the stock to Sonitrol Corporation and irrevocably appointing an escrow agent with full power to transfer the stock ownership. The Court also entered two Consent Judgments on January 27, 1988, one in favor of Sonitrol for $197,122.12 and the other in favor of SFC in the amount of $234,143.27.

Several provisions of the settlement documents bear particular notice. The Settlement Agreement gave Sonitrol and SFC the right to execute on the judgment upon default. To that end, the Escrow Agreement provided for two possible dispositions of the SOKC stock. First, upon notice of default, the escrow agent was to immediately transfer the stock certificate and stock power to Sonitrol. However, if SOKC made full payment of the notes by the date due, the escrow agent was to return the stock back to SOKC upon written notice of satisfaction by Sonitrol.

By December 1992, SOKC had paid the full amount of the larger note. However, on December 30 and 31, 1992, SOKC informed SFC that it would not be able to pay the smaller note before the due date of January 1, 1993. At 2:14 PM on December 31, 1992, SFC served notice on the escrow agent that SOKC had repudiated the agreements and was in default, demanding that OKC Title deliver the stock in accordance with the provisions of the Escrow Agreement. At 2:49 PM that same day, the Yearys filed their individual Chapter 13 bankruptcy petition in the Bankruptcy Court for the Western District of Oklahoma, 92–18419(LN).

The Yearys offered to pay the amount outstanding on January 6, 1993, an offer that

was refused by SFC.[1] Later in January 1993, the Yearys submitted a Plan of Reorganization under Chapter 13 of the Bankruptcy Code providing for the repayment of the second note within five days of confirmation in a one lump sum or, as an alternative, an extended payment plan with interest. The Bankruptcy Court confirmed the Yearys' Chapter 13 plan on April 12, 1993 over the objection of Sonitrol.[2]

## SUMMARY JUDGMENT

Summary judgment is appropriate if the pleadings, affidavits and depositions "show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Any doubt as to the existence of a genuine issue of material fact must be resolved against the party seeking summary judgment. In addition, the inferences drawn from the facts presented must be construed in the light most favorable to the nonmoving party. *Board of Education v. Pico,* 457 U.S. 853, 863, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982). If there can be but one reasonable conclusion as to the material facts, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Only genuine disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Id.* at 248, 106 S.Ct. at 2510. In order to prevail, the movant must show entitlement to judgment as a matter of law. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985); Fed.R.Civ.P. 56(c).

The central legal question in this case is whether the Yearys' stock in SOKC should be considered part of their Chapter 13 bankruptcy estate. Two questions frame the

Court's inquiry. First, did the settlement documents remove the Yearys' equitable interest in the stock from being considered part of the bankruptcy estate? Second, was there an anticipatory breach by SOKC of a bilateral contract with Sonitrol and SFC, thereby enabling Sonitrol to instruct the escrow agent to give it actual possession of the stock and extinguishing the Yearys' legal rights? Plaintiffs argue that the settlement documents irrevocably transferred the Yearys' interest in the stock, pointing to the language of the stock power, with its language of present transfer, and the stock pledge agreement, indicating immediate transfer from the escrow agent to SFC upon notification of default. Defendants argue that SFC obtained a security interest, at most, in the stock, contingent on SOKC's default. Thus, the Yearys assert, the stock should be considered part of their Chapter 13 bankruptcy estate subject to lien. The Court believes plaintiffs' characterization is correct.

The starting point for the Court's analysis is the Bankruptcy Code. Property of the estate is defined in 11 U.S.C. § 541(a) as including "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (West 1993). The Supreme Court has given this language a broad reading, finding that Congress intended a wide range of property interests to be included in the bankruptcy estate. *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983). The Court found that even property in which the debtor did not have a possessory interest at the time the bankruptcy proceedings commenced could be included in the estate, including property of the debtor repossessed by a secured creditor. *Id.* at 205–6, 103 S.Ct. at 2313–14.

---

**1.** Sonitrol and SFC dispute SOKC's ability to satisfy the second note at that time, noting that SOKC did not have a written loan commitment until February 25, 1993 and immediate funds available until April 14, 1993.

**2.** Simultaneous with the Yearys' offer to pay, SFC began garnishment proceedings against SOKC, recovering $8,396.90 from the corporate bank account. In addition, Sonitrol and SFC have filed a proof of claim with the Bankruptcy

Court in the amount of $431,265.39, the full uncredited amount of both notes plus interest from the date of entry of the 1988 settlement agreement. The Yearys maintain that the amount owed SFC is the unpaid balance less the amount recovered by the garnishment. However, the question of the precise amount of Sonitrol's and SFC's claim is not part of the adversary proceeding before the Court at this time.

The Supreme Court acknowledged, however, that there were limits on what property could be included as part of the estate under § 541(a). *Id.* at 205 n. 8, 103 S.Ct. at 2314 n. 8 ("The legislative history indicated that Congress intended to exclude from the estate property of others in which the debtor had some minor interest such as a lien or bare legal title."); *see also Matter of O.P.M. Leasing Services, Inc.,* 46 B.R. 661 (Bankr.S.D.N.Y.1985). Rather, "the legislative history makes note of the broad scope of the definition, but also makes clear that the definition was not designed to enlarge the debtor's rights against others beyond those existing at the commencement of the case." *In re N.S. Garrott & Sons,* 772 F.2d 462, 465–66 (8th Cir.1985); *see also In re Dunlap,* 158 B.R. 724 (M.D.Tenn.1993); *In re All Chemical Isotope Enrichment, Inc.,* 127 B.R. 829, 837 (Bankr.E.D.Tenn.1991). The Bankruptcy Code also provides for exclusion in § 541(d). This section states,

property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, ... becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d) (West 1993). Thus, for example, property held by a debtor or their agent in constructive trust is not considered property of the debtor's bankruptcy estate. *See In re First Capital Mortgage Loan Corp.,* 917 F.2d 424, 426 (10th Cir.1990); *In re Seneca Oil Co.,* 906 F.2d 1445, 1453 (10th Cir.1990); *In re Mahan & Rowsey, Inc.,* 817 F.2d 682, 684 (10th Cir.1987); *First Security Bank of Utah, N.A. v. Gillman,* 158 B.R. 498 (D.Utah 1993). *See also Begier v. Internal Revenue Service,* 496 U.S. 53, 61, 110 S.Ct. 2258, 2264, 110 L.Ed.2d 46 (1990).

A debtor's equitable and legal interests in property are determined by state law. *See Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re Seneca Oil Co.,* 906 F.2d at 1450; *In re Crouch C Stores, Inc.,* 120 B.R. 178 (Bankr. D.Kan.1990). The general rule with respect to property held in escrow is that

[t]he deposit of a deed in escrow creates in the grantee such an equitable interest in the property that upon full performance of the condition according to the escrow agreement, the title will vest at once in him. Hence, although pending the full performance of the conditions, the legal title remains in the grantor and is subject to attachment or the lien of a judgment against him to the extent of his interest therein, it has been held that such lien, obtained with notice of the escrow agreement, is subject to the equity of the grantee.

28 Am.Jur.2d *Escrow* § 10 (1966). Under Oklahoma law, an escrow agreement passes the equitable interest to the recipient, leaving the grantor with only the legal title. *Fouts v. Foudray,* 31 Okl. 221, 120 P. 960 (1912).[3] In the context of a case involving money held in escrow in anticipation of receiving marketable title to property, the Oklahoma Supreme Court stated,

The effect of thus placing the money in the bank [in escrow] was to render it irreclaimable by intervenor except in case of failure on the part of plaintiffs to fulfill the agreement ... It is clear that if intervenor had paid the money direct to plaintiffs under the same circumstances he could not reclaim it. As between the parties, we perceive no difference in the fact that the money was paid to a third party for the benefit of plaintiff than if it had been paid directly to plaintiff.

*Burford v. Bridwell,* 199 Okl. 245, 185 P.2d 216, 219 (1947) (citations omitted). Thus, an escrow agent is the trustee of both the grantor and the grantee and must comply with the express dictates of the escrow agreement

---

3. *Fouts* specifically dealt with the passage of title to real property, subject to a mortgage, that was destroyed by fire. 120 P. at 961. Defendants claim that this case is inapplicable because it concerns title to an interest in land. However, the Oklahoma courts are mute on whether other types of escrow arrangements should be treated differently. Because of this silence, the Court can only conclude that the *Fouts* rule applies to all escrow arrangements governed by Oklahoma law.

upon performance or failure of the necessary condition. *Id.*

In order to determine the relevant property interests of the parties in the SOKC stock, we must examine all the settlement documents as a whole. *See First Security Bank of Utah,* 158 B.R. at 505 ("Where an alleged transfer of ownership is predicated on a written agreement, traditional rules of contract construction apply."). Plaintiffs and defendants each point to various provisions of the documents in support of their position. In particular, defendants suggest that language in the Settlement Agreement indicating that the stock was intended to be security for the Promissory Notes, in the Promissory Notes stating that they were secured by the stock and in the Stock Pledge Agreement denoting Sonitrol's interest as a security interest gave Sonitrol only a lien on the value of the stock. However, these documents must be read in conjunction with the Escrow Agreement and Stock Power, as well.

If the stock had not been subject to an escrow arrangement, the Court might have been more willing to construe the interests of the parties in the stock more favorably to defendants. The Escrow Agreement creates an arrangement different from that of a mere security interest. Rather, the creation of the escrow by the parties in 1988 changed the Yearys' interest in the stock to a contingent equitable interest; the Yearys retained bare legal title. Sonitrol also received a contingent equitable interest in the stock, contingent on the Yearys' default. The Stock Power was merely the vehicle by which to effectuate the Escrow Agreement, making the transfer of the stock to the escrow irrevocable until satisfaction or failure of the contingency by January 1, 1993 and empowering the escrow agent to give Sonitrol immediate possession of the stock upon notice of default. Thus, the back-up for the Promissory Notes was the contingent equitable interest the Yearys gave Sonitrol by virtue of the Escrow Agreement, the Stock Power, the Stock Pledge Agreement and the Settlement Agreement. Construing all the settlement documents together, documents the Court finds unambiguous as a matter of law, the Yearys only had legal title with a contingent equitable interest after January 1988.[4]

The question then becomes what to make of the Yearys' interest in the escrowed stock in light of the provisions of the Bankruptcy Code. In *Matter of Newcomb,* 744 F.2d 621 (8th Cir.1984), the Eighth Circuit dealt with a circumstance analogous to the case at bar. In *Newcomb,* the court of appeals, examining Missouri law, found that when an escrow agreement is entered into and funds are turned over to the escrow agent, both parties have a contingent interest dependent upon the occurrence (or non-occurrence) of the required condition. *Id.* at 626. At the time the condition is satisfied, the transfer becomes unavoidable and the entire interest passes to the recipient. *Id.* at 626–27. Thus, the Eight Circuit held, the bankruptcy estate is deprived of nothing of value when the condition occurs because the condition extinguished only the remaining legal interest. *Id.* at 627. Rather, at the formation of the escrow, the subject of the agreement was removed from being considered an object of value for the purposes of satisfying creditors and, thus, should not be considered part of the bankruptcy estate.[5] *Id.* *See also In re Royal Business School, Inc.,* 157 B.R. 932, 940 (Bankr.E.D.N.Y.1993); *All Chemical Isotope Enrichment,* 127 B.R. at 838; *O.P.M. Leasing Services,* 46 B.R. at 667–68.

---

4. At the March 1, 1994 hearing before the Court, counsel for defendants briefly raised the issue whether plaintiffs' interest in the stock was properly handled under the UCC. In the absence of full briefing by the parties on this issue, the Court renders no opinion regarding the property of the transaction under Oklahoma's codification of the relevant UCC provision, Okla.Stat. tit. 12A, § 8–312. However, the Court sees no obvious reason why the arrangement between the parties in this case would have run afoul of the UCC.

5. One could also analogize the escrow to a trust in which the escrow agent holds the equitable interest as an agent of the grantor who holds only the legal title. Thus, the analysis in *Newcomb* comports with the Oklahoma rule that equitable title passes when an escrow is created, as well as the cases excluding from the bankruptcy estate property held by the debtor in constructive trust. *See, e.g., Mahan & Rowsey,* 817 F.2d at 684. The actual full equitable value of the stock cannot then be used to satisfy a creditor of the donor since the donor's estate does not actually possess it after the creation of the escrow.

The Court finds *Newcomb* to be persuasive on the issue of whether the stock should be considered part of the bankruptcy estate of the Yearys. No matter when the Chapter 13 bankruptcy petition was filed, the Yearys would not have been able to use their equitable interest in the SOKC stock for the purpose of satisfying any of their creditors. Moreover, at a minimum, the legal interest of the Yearys' expired on January 1, 1993 when the required payment was not made to SFC. At that time, default on the second Promissory Note would have enabled Sonitrol to instruct OKC Title to give it possession of the stock under the Escrow Agreement, thereby extinguishing all rights of the Yearys to the stock. Consequently, the Court concludes that the stock cannot be considered part of the Yearys' bankruptcy estate because the stock's equity was not subject to the Yearys' exclusive control after creation of the escrow in 1988. To find otherwise would enable the Yearys to succeed to a greater interest as debtors-in-possession under Chapter 13 than they had before filing their bankruptcy petition. Such a result would be contrary to case law and § 541 of the Bankruptcy Code.

■ In any event, the Court finds that SOKC repudiated the settlement agreement when it notified SFC that it would not make payment by the date due. On December 31, 1992, SOKC clearly communicated to SFC that it had no intention of complying with the requirement that full payment on the notes be made by January 1, 1993. Moreover, SOKC did not indicate that it had the ability to perform sometime before the close of business that day. SOKC's anticipatory breach cleared the way for Sonitrol to declare a default and, at 2:14 PM, instruct OKC Title to turn over possession of the stock. Consequently, the Court finds that both the legal and equitable interests of the Yearys in the SOKC stock were extinguished before they filed their bankruptcy petition at 2:49 PM.

■ Defendants go to great lengths to try to prove that the settlement agreement was not bilateral.[6] The Court finds defendants' argument unconvincing and unsupported by the actual Settlement Agreement. It is significant that the entire settlement process was conducted at a time when Sonitrol and SFC had a right to collect on their judgments. This was not a circumstance, such as a traditional purchase money mortgage, in which a creditor voluntarily loaned money to a debtor who subsequently defaulted. Rather, the entire purpose of the settlement from the Yearys' standpoint was to forestall the seizure of SOKC's franchise and permit the Yearys to operate the business while the company paid off the outstanding amounts owed under the judgments. There was a clear promise for a promise in the Settlement Agreement—no enforcement of the judgments and no seizure of the franchise by Sonitrol in exchange for payment of the Promissory Notes by SOKC. Analogizing to a Kansas Supreme Court case, "It is clear that the agreement ... was an executory bilateral contract. Each party was to do certain things—plaintiff was to forbear bringing a tort action [in this case, enforcement of the judgments], and defendants were to make the payments." *Mabery v. Western Casualty & Surety Co.*, 173 Kan. 586, 250 P.2d 824, 828 (1952).

■ Defendants raise two additional issues that bear comment by the Court. First, throughout the bankruptcy proceedings, the Yearys have tried to treat Sonitrol and SFC as creditors of their own estate. As stated above, the Court finds that the SOKC stock was not a part of the bankruptcy estate and, therefore, the Bankruptcy Court has no power to include it as an asset to satisfy *creditors of the Yearys*. Further, Sonitrol and SFC are not creditors of the Yearys because the judgments were against Sonitrol of Oklahoma City only and the Settlement Agreement was signed by James Yeary in his capacity as president of the company. The Court questions the power of the Yearys to reorganize the debt of SOKC in their Chapter 13 plan, as well as the power of the Bankruptcy Court to confirm such a plan, when Sonitrol is not a creditor of their personal bankruptcy estate. The Yearys' true motive appears to have been to use the pow-

---

6. If the settlement agreement was unilateral only, Sonitrol would not have been empowered to declare SOKC to be in default before the actual scheduled date of full performance, January 1, 1993.

er of the Bankruptcy Code and the Bankruptcy Court to force a renegotiation of the terms of SOKC's settlement with Sonitrol and SFC. This was an improper use of the bankruptcy remedy.

 Finally, defendants argue that the Court should intervene in this action to prevent Sonitrol from seizing ownership of SOKC because it would be a "harsh result" in light of the amount of money owed under the second note. Harsh though they may be, the terms of the settlement allowing for the irrevocable transfer of ownership of SOKC upon default control this case. The Court cannot reform the settlement agreement, absent some showing of unconscionability for example, in order to prevent Sonitrol from doing what it had a legal right to do before the agreement was entered in 1988. Given the negotiating environment under the September 1987 judgment against SOKC, the Court finds no unconscionability. Moreover, nothing in the settlement documents permitted a reduction in the amount of the escrow as SOKC made payments under the Promissory Notes. Absent some type of offset provision, the Court will not intervene to enable the Yearys to abrogate the express terms of the settlement documents.

### CONCLUSION

When Sonitrol of Oklahoma City and the Yearys entered into negotiations with plaintiffs to forestall the execution of this Court's judgments in 1987, defendants bet their entire interest in the company. Unfortunately for the Yearys, it was a gamble that did not pay off. Plaintiffs' Motion For Summary Judgment is GRANTED. Defendants' Motion For Summary Judgment is DENIED. Plaintiffs are awarded possession and legal and equitable ownership of the stock of Sonitrol of Oklahoma City. Because the Court is informed that the actual stock certificates are missing, the parties are instructed to determine how to effect a physical transfer of the stock ownership and report to the Court not later than March 29, 1994.

It is so ordered.