In re James Harrison YEARY and Linda Jensen Yeary, Debtors,

SONITROL FINANCIAL CORPORATION, a Delaware corporation, now known as Advantor Capitol Corporation, a Virginia corporation, Plaintiff–Appellee,

v.

OKLAHOMA CITY ABSTRACT & TITLE CO., an Oklahoma corporation, Defendant–Appellee,

and

James Harrison Yeary and Linda Jensen Yeary, Defendants–Appellants.

Nos. 94–6109, 94–6190.

United States Court of Appeals, Tenth Circuit.

May 16, 1995.

Richard E. Coulson (David Kline and Steven Minty with him on the briefs) of Kline & Kline, Oklahoma City, OK, for Yeary defendants-appellants.

John B. Heatly of Fellers, Snider, Blankenship, Bailey & Tipens, Oklahoma City, OK, for plaintiff-appellee Sonitrol.

Before SEYMOUR, Chief Judge, McKAY, Circuit Judge, and BELOT,\* District Judge.

SEYMOUR, Chief Judge.

James Harrison Yeary and Linda Jensen Yeary appeal the district court's ruling that 10,500 shares of stock are not includable in their bankruptcy estate. In granting summary judgment to Sonitrol Financial Corporation (SFC), the court construed an agreement between the parties as constituting a conditional equitable conveyance of the stock to SFC which took effect prior to the Yearys' bankruptcy. *See Sonitrol Fin. Corp. v. Oklahoma City Abstract & Title Co. (In re Yeary)*, 164 B.R. 997 (W.D.Okla.1994). The Yearys assert on appeal that the earlier agreement merely granted SFC a security interest in the stock. We agree and reverse.

## I.

The Yearys have been the stockholders, officers, and directors of Sonitrol of Oklahoma City (SOKC), a central alarm security company, since they founded the company in 1979. In 1986, the Sonitrol Corporation and its subsidiary, SFC, sued SOKC for breach of its franchise agreement with Sonitrol, breach of its equipment lease agreement with SFC, and failure to pay on a note owing to SFC. The district court in that action granted partial summary judgment against SOKC for all amounts due on the equipment lease agreement.

After entry of the judgment, the parties entered into a settlement agreement which is the subject of the current litigation. Pursuant to that agreement, Sonitrol and SFC agreed to refrain from executing on the outstanding judgment in exchange for two promissory notes from SOKC. The first note (Note 1) for $337,169.39 with interest was payable in monthly installments, Aplt. App. at 157–58, while the second note for $94,096 plus interest required final payment on or before January 1, 1993, *id.* at 159–60. James Yeary signed both notes as President of SOKC. The agreement provided that the Yearys would execute a Stock Pledge Agreement, pledging all of their stock in SOKC "[a]s security for" the payment of the promissory notes. *Id.* at 153, ¶ 2. As "further security" for the notes, the agreement called for SOKC to execute a Stipulation for Consent Judgment in the original case. *Id.* at 153, ¶ 3.

The Stock Pledge Agreement stated that "in consideration for the Settlement Agreement and the two Promissory Notes executed by SOKC ..., the STOCKHOLDERS desire to pledge their stock in SOKC as security for such obligations of SOKC." *Id.* at 161. The Agreement also provided:

> *Collateral.* As security for payment of SOKC's obligations under the Settlement Agreement and Promissory Notes, the STOCKHOLDERS hereby grant to SONITROL a security interest in *10,500* common shares of SOKC stock, which shares represent one hundred percent (100%) of all authorized and outstanding shares of SOKC stock....

designation.

---

\* The Honorable Monti L. Belot, United States District Judge for the District of Kansas, sitting by

*Id.* Both James and Linda Yeary signed the Stock Pledge Agreement in their individual capacities, and James also signed in his official capacity as President of SOKC. *Id.* at 164.

The Stock Pledge Agreement required the transfer to an escrow agent of the stock certificate and a Stock Power, endorsed by both Yearys to Sonitrol. *Id.* at 161. The Stock Power provided, "FOR VALUE RECEIVED, we hereby sell, assign, and transfer to SONITROL CORPORATION *10,500* shares of the capital stock of SONITROL OF OKLAHOMA CITY, INC." *Id.* at 165.

Pursuant to the terms of the Settlement Agreement and the Stock Pledge Agreement, Sonitrol, SFC, and the Yearys entered into an Escrow Agreement with Oklahoma City Abstract and Title Company ("Escrow Agent"). *Id.* at 166–71. The Escrow Agreement provided:

(a) Upon notice by Sonitrol to the Escrow Agent (with a copy of the notice to SOKC and the Stockholders) of a default under the Stock Pledge Agreement and Settlement Agreement, the Escrow Agent shall immediately transfer the stock certificate and stock power annexed thereto to Sonitrol; or

(b) Upon written notice from Sonitrol that SOKC's obligation under the Settlement Agreement and Promissory Notes have been satisfied in full by SOKC, the Escrow Agent shall return to SOKC all such shares held as collateral security.

*Id.* at 167. The Escrow Agreement, which incorporated both the Settlement Agreement and the Stock Pledge Agreement, was also signed by both Yearys in their individual capacities and by James Yeary as President of SOKC. *Id.* at 170–71.

SOKC paid Note 1 on schedule, but on December 30 and 31, 1992, it notified SFC that it would be unable to pay Note 2 before the due date of January 1, 1993. At 2:14 p.m. on December 31, 1992, SFC served no-

tice on the escrow agent that SOKC had repudiated the agreements and was in default. Thirty-five minutes later, at 2:49 p.m., the Yearys filed their individual Chapter 13 bankruptcy petition in the Bankruptcy Court for the Western District of Oklahoma. They scheduled their stock in SOKC as an asset of the bankruptcy estate.

The Yearys offered to pay the amount outstanding on Note 2 on January 6, 1993.[1] SFC refused the offer and filed a bankruptcy adversary proceeding, claiming that the Yearys' stock in SOKC had ceased to be their property prior to the Chapter 13 filing and thus was not includable in the bankruptcy estate.[2] The Escrow Agent was also named as a defendant in the action because it had possession of the stock certificate and stock power.

The district court withdrew the adversary proceeding from the bankruptcy court, and the parties filed cross-motions for summary judgment. Focusing on the fact that the Yearys placed the stock in escrow, the court noted that, "[u]nder Oklahoma law, an escrow agreement passes the equitable interest to the recipient, leaving the grantor with only the legal title." *In re Yeary*, 164 B.R. at 1001. The court thus characterized both parties' interests in the stock as "contingent equitable interest[s]" dependent upon the Yearys' payment or non-payment of the promissory notes. *Id.* at 1002. On this basis, the court concluded that the stock was not includable in the Yearys' bankruptcy estate because "the stock's equity was not subject to the Yearys' exclusive control after creation of the escrow in 1988." *Id.* at 1003.

Furthermore, the court found that SOKC repudiated the settlement agreement when it notified SFC that it would be unable to make a timely payment, thereby extinguishing the Yearys' legal interest in the stock prior to their bankruptcy filing. *Id.* The court therefore held that because the stock had ceased to be property of the Yearys prior to

---

1. SFC contends that the Yearys did not have the ability to pay the note at that time. Aplee.Br. at 18. This dispute is irrelevant to our decision.

2. During the original litigation, Sonitrol and SFC were parent and subsidiary. Following a corpo-

rate restructuring, however, SFC has become Advantor Capital Corporation. All of Sonitrol's interest in and under the Settlement Agreement has been assigned to SFC.

their filing for bankruptcy it was not property of the bankruptcy estate.

The court granted SFC's motion for summary judgment and ordered the escrow agent to transfer the stock certificates to SFC. Upon filing this appeal, the Yearys filed a motion with the district court to stay enforcement of its order pending appeal. The district court entered an order on April 12, 1994, conditioning the stay upon the Yearys' posting of a $1.5 million bond. At the time of the bankruptcy filing, the unpaid balance on Note 2 was $94,096 plus accrued interest, for an estimated total of $150,000. Aplt.App. at 190. Although the Yearys maintain that the stock is worth $1.5 million, SFC values the SOKC stock at $150,000. *Id.* at 7, 184. We modified the April 12 order, reducing the bond amount to $150,000 and mandating that the clerk of the district court maintain custody of the stock certificates pending the outcome of this appeal.

We review de novo the district court's grant of summary judgment to SFC and its denial of summary judgment to the Yearys. *Octagon Gas Sys., Inc. v. Rimmer,* 995 F.2d 948, 952 (10th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993). Because we conclude that the relevant documents unambiguously indicate an intent to create a security interest in the SOKC stock, we reverse and remand.

## II.

■■■ The Uniform Commercial Code (UCC) defines a security interest as "an interest in personal property ... which secures payment or performance of an obligation." Okla.Stat. tit. 12A, § 1–201(37)(a) (1981 & Supp.1984). The intent of the parties is often a determinative fact in construing an interest in property as a security interest. *See Percival Constr. Co. v. Miller & Miller Auctioneers,* 532 F.2d 166, 171 (10th Cir.1976). Where a written agreement is unambiguous, the intent of the parties is a question of law and is to be gleaned from the agreement itself. *See id.* If the agreement

contains ambiguities, extrinsic evidence factors into the determination, and the intent of the parties becomes a question of fact for a jury to decide. *Id.* Therefore, in order for a court to determine the intent of the parties as a matter of law, the relevant documents must be unambiguous.

The Settlement Agreement provides that the Yearys' SOKC stock would serve "[a]s security for" the payment of the promissory notes. Aplt.App. at 153, ¶ 2. The Stock Pledge Agreement unequivocally states, "As *security* for payment of SOKC's obligations under the Settlement Agreement and Promissory Notes, the STOCKHOLDERS hereby grant to SONITROL a *security interest* in 10,500 common shares of SOKC Stock...." *Id.* at 161 (emphasis added). The Escrow Agreement provides that the escrow agent should either transfer the stock certificates and stock power to SFC upon SOKC's default or return to SOKC "all such shares held as collateral security" upon SOKC's fulfillment of its obligations under the Settlement Agreement. *Id.* at 167. This language clearly manifests the intent of the parties to grant SFC an interest in the stock in order to secure SOKC's payment of the promissory notes.

In concluding that the relevant documents did not create a security interest but rather effected an equitable transfer, the court below focused on the fact that the Yearys placed their stock certificates and endorsed stock power into escrow.[3] The court noted that "[u]nder Oklahoma law, an escrow agreement passes the equitable interest to the recipient." *In re Yeary,* 164 B.R. at 1001. In support of this proposition, the court cited only cases involving the passage of title to real property. Responding to the Yearys' arguments that such cases were inapplicable to this context, the court held that because Oklahoma courts were silent on whether other types of escrow arrangements should be treated differently, it would apply

---

**3.** The district court noted, "If the stock had not been subject to an escrow arrangement, the Court might have been more willing to construe the interests of the parties in the stock more favorably to [the Yearys]. The Escrow Agreement creates an arrangement different from that of a mere security interest." *In re Yeary,* 164 B.R. 997, 1002 (W.D.Okla.1994).

the real estate rule. *Id.* at 1001 n. 3.[4]

■ We are persuaded, however, that Oklahoma law requires different treatment for stocks placed in escrow. Under the UCC, "[a] security interest in a security is enforceable and can attach only if it is transferred to the secured party or a person designated by him pursuant to a provision of Section 8–313(1)." Okla.Stat. tit. 12A § 8–312(1). Section 8–313(1)(a) provides that the transfer of a security interest occurs only when the secured creditor or his designee "acquires possession" of the security. A physical transfer is therefore essential to the creation of an enforceable security interest in a security under Oklahoma law.

Pursuant to the Escrow Agreement, the designated escrow agent took possession of the SOKC stock with instructions to hold it until the Yearys' default on or payment of the promissory notes. By providing for the transfer of the stock to a neutral third party, the parties fulfilled the requirements of section 8–321(1). *Cf. In re Copeland,* 531 F.2d 1195, 1202–04 (3d Cir.1976) (possession of stocks by an escrow agent who is not an agent of the debtor alone satisfied the perfection by possession requirements of section 9–305); 2 White & Summers, *Uniform Commercial Code* § 24–12 at 353 (3d ed. 1988). Thus, rather than nullifying the language of security interest in the documents, the Escrow Agreement is further evidence of the parties' intent to create a security interest in the SOKC stock.[5]

SFC contends that this intent is irrelevant because Article Nine of the UCC excludes the agreement here. Section 9–104(g) provides that the article does not apply to "a right represented by a judgment." Okla. Stat. tit. 12A, § 9–104(g). SFC asserts that

the entire settlement agreement is outside the scope of Article Nine because the Yearys executed two consent judgments and pledged them "as further security" for the promissory notes.

Section 9–104(g) does exempt the assignment of judgments from Article Nine coverage. *See Law Research Serv. v. Martin Lutz Appellate Printers, Inc.,* 498 F.2d 836 (2d Cir.1974). It is unclear whether the exclusion applies to consent judgments as well as judgments rendered by a court and assigned to a third party. We need not address this issue, however, as the Yearys did not schedule the judgments as property of their estate. The district court order disposes only of the SOKC stock, collateral which clearly falls within the scope of Article Nine. The exclusion of some collateral does not render Article Nine inapplicable to the remainder of the agreement.

In sum, we conclude that the relevant documents unambiguously manifest an intent to grant SFC a security interest in the SOKC stock pursuant to Article Nine of the U.C.C.

### III.

■ Because the district court erroneously classified the agreement as an equitable transfer, it held that the SOKC stock was not property of the Yearys' bankruptcy estate. Section 541(a)(1) defines estate property as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (1988). "This authorization extends even to property of the estate in which a creditor has a secured interest." *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 203, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983). The SOKC stock, although subject to SFC's security interest,

---

**4.** The court also found *Carlson v. Farmers Home Admin. (Matter of Newcomb),* 744 F.2d 621 (8th Cir.1984), to be persuasive. The court relied upon *Newcomb* for the proposition that "at the formation of the escrow, the subject of the agreement was removed from being considered an object of value for the purposes of satisfying creditors and, thus, should not be considered part of the bankruptcy estate." *In re Yeary,* 164 B.R. at 1002. We conclude that *Newcomb* is not analogous to the case at hand. Applying Missouri law, the Eighth Circuit in *Newcomb* held that funds were "transferred" for bankruptcy purposes at the time the debtor placed them in

escrow. Unlike the current case where the Yearys used the escrowed stocks to secure the promissory notes, there is no suggestion in *Newcomb* that the debtor used the escrowed funds to secure any other obligation. Instead, the debtor in *Newcomb* placed the amount of the court judgment into escrow pending the outcome of the appeal.

**5.** Likewise, the language of absolute transfer in the Stock Power, *see* Aplt.App. at 165, is consistent with a secured transaction involving stock.

is therefore includable in the Yearys' bankruptcy estate.[6]

The district court also held that because the original judgment was against SOKC and not the Yearys, SFC is a creditor of SOKC, not a creditor of the Yearys' personal bankruptcy estate. Although James Yeary signed the promissory notes only in his capacity as SOKC President, both Yearys signed the Settlement Agreement, Stock Pledge Agreement, and Escrow Agreement pledging their own SOKC stock as security. The Yearys are not personally liable for the notes, but the notes are secured by the Yearys' property. A claim against the property of a debtor constitutes a "claim" against the debtor for purposes of federal bankruptcy law. *See Johnson v. Home State Bank,* 501 U.S. 78, 85, 111 S.Ct. 2150, 2154–55, 115 L.Ed.2d 66 (1991). Therefore, the SOKC stock is property of the Yearys' personal bankruptcy estate.

Because we conclude that the SOKC stock is includable in the Yearys' bankruptcy estate, we REVERSE and REMAND to the district court for further proceedings in accordance with this opinion.

---

**6.** Prior to filing their bankruptcy petition, the Yearys notified SFC that they would be unable to pay Note 2 on schedule. SFC declared a default and instructed the escrow agent to turn over possession of the stock. The district court construed this chain of events as an anticipatory breach by the Yearys and found that "both the legal and equitable interests of the Yearys ... were extinguished before they filed their bankruptcy petition." 164 B.R. at 1003. Even if the Yearys' anticipatorily breached the agreement, the escrow agent did not transfer the stocks, and any future transfer is subject to the automatic stay provisions of section 362(a). 11 U.S.C. § 362(a) (1988).